UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD DEWAYNE HUNT, )
                                                 )
        Petitioner, )         CASE NO. 2:07-cv-01052-RSL-JLW
                                                 )
        v. )
                                                 )
CLAUDE FINN, Warden, *et al*., )         REPORT AND RECOMMENDATION
                                                 )
        Respondents. )
_____ )

I.    SUMMARY

Petitioner Richard Dewayne Hunt is currently incarcerated at the Deuel Vocational Institution in Tracy, California. He pled guilty to second degree murder in Trinity County Superior Court on December 10, 1990, and is currently serving a sentence of 15-years-to-life with the possibility of parole. He has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2006 denial of parole by the Board of Parole Hearings of the State of California (the "Board").[1] (*See* Docket 1.) Petitioner also requests that the Court take judicial notice of a Santa Clara County Superior Court Order entered in an unrelated state habeas case. (*See* Dkt. 8.) Respondent has filed an answer to the petition together with

---

[1] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1, 2005. *See* California Penal Code § 5075(a).

REPORT AND RECOMMENDATION -1

relevant portions of the state court record, as well as an opposition to petitioner's request for judicial notice. (*See* Dkt. 6 and 9.) Petitioner has filed a traverse in reply to the answer, and filed a response to the opposition to his request for judicial notice. (*See* Dkt. 7 and 10.) The briefing is now complete and this matter is ripe for review. The Court, having thoroughly reviewed the record and briefing of the parties, recommends the Court strike the request for judicial notice as moot, deny the petition, and dismiss this action with prejudice.

II. BACKGROUND

Petitioner began participating in a marijuana-growing operation at a sheepshank ranch in southern Trinity County in April 1987 in exchange for ten percent of the profits from the crop. (*See* Dkt. 1, Exhibit A at 9-10.) On June 22, 1987, petitioner was checking marijuana gardens with another ranch worker, Carl Rogers, when they discovered that an underground water tank was empty. (*See id*. at 10.) Rogers became irate and ordered petitioner to fix the waterline and finish the work in the garden. (*Id*.) Petitioner asserts that he was afraid of Rogers, who was always armed with a .30 caliber revolver. (*Id*.) After working on the waterline and garden, petitioner returned to the ranch house due to the heat. (*See id*. at 10-11.) Inside the house, petitioner told a witness that he thought Rogers was going to physically assault him for not finishing his work in the garden. (*See id*. at 11.) Petitioner then armed himself with his own .12 gauge shotgun, and loaded it with five shells. (*Id*.) When Rogers returned to the ranch house, petitioner confronted him. (*Id*.) The two men began cursing at each other. (*Id*.) Without warning, petitioner shot at Rogers, who sought shelter behind a pickup truck. (*Id*.) A shootout ensued. (*Id*.) When petitioner ran out of ammunition, he heard Rogers yell either "you got me, it's over," or "give it up, you got me." (*Id*.) Despite hearing Rogers surrender, petitioner entered the ranch house, reloaded his shotgun, and then

REPORT AND RECOMMENDATION -2

returned to the truck, where he observed Rogers lying face down with his gun in his hand. (*Id*.) Petitioner shot Rogers again in the back at close range. (*Id*.) He dragged the body behind the house, and buried it on the property the next day. (*Id*. at 11-12.)

Petitioner pled guilty to second degree murder in Trinity County Superior Court on December 10, 1990, and began serving his sentence of 15-years-to-life with the possibility of parole on February 1, 1991. (*See id*. at 1.) His minimum eligible parole date was November 4, 2000. (*Id*.) Thus, petitioner has been incarcerated for the past eighteen years.

The parole denial which is the subject of this petition took place after a parole hearing held on November 14, 2006. This was petitioner's fourth application. (*See* Dkt. 1 at Attachment 1.) His previous applications were also denied. After denial of his 2006 application, petitioner filed habeas corpus petitions in the Trinity County Superior Court, California Court of Appeal, and California Supreme Court. Those petitions were unsuccessful. This federal habeas petition followed. Petitioner contends his 2006 denial by the Board violated his Fifth and Fourteenth Amendment Due Process rights. Thus, petitioner does not challenge the validity of his conviction, but instead challenges the Board's 2006 decision finding him unsuitable for parole.

III.    STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this petition because it was filed after the enactment of AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Because petitioner is in custody of the California Department of Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive vehicle for his habeas petition. *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir.), *cert. denied*, 543 U.S. 991 (2004) (providing that § 2254 is "the exclusive vehicle for a habeas

REPORT AND RECOMMENDATION -3

petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction."). Under AEDPA, a habeas petition may not be granted with respect to any claim adjudicated on the merits in state court unless petitioner demonstrates that the highest state court decision rejecting his petition was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

As a threshold matter, this Court must ascertain whether relevant federal law was "clearly established" at the time of the state court's decision. To make this determination, the Court may only consider the holdings, as opposed to dicta, of the United States Supreme Court. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000). In this context, Ninth Circuit precedent remains persuasive but not binding authority. *See id.* at 412-13; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

The Court must then determine whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. At all

times, a federal habeas court must keep in mind that it "may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be [objectively] unreasonable." *Id.* at 411.

In each case, the petitioner has the burden of establishing that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). To determine whether the petitioner has met this burden, a federal habeas court looks to the last reasoned state court decision because subsequent unexplained orders upholding that judgment are presumed to rest upon the same ground. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

Finally, AEDPA requires federal courts to give considerable deference to state court decisions, and state courts' factual findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1). Federal courts are also bound by a state's interpretation of its own laws. *See Murtishaw v. Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713 (9th Cir. 1993)).

IV.   FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

A.   *Due Process Right to be Released on Parole*

Under the Fifth and Fourteenth Amendments to the United States Constitution, the government is prohibited from depriving an inmate of life, liberty or property without the due process of law. U.S. Const. amends. V, XIV. A prisoner's due process claim must be analyzed in two steps: the first asks whether the state has interfered with a constitutionally protected liberty or property interest of the prisoner, and the second asks whether the

procedures accompanying that interference were constitutionally sufficient. *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006).

Accordingly, our first inquiry is whether petitioner has a constitutionally protected liberty interest in parole. The Supreme Court articulated the governing rule in this area in *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482 U.S. 369 (1987). *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying "the 'clearly established' framework of *Greenholtz* and *Allen"* to California's parole scheme). The Court in *Greenholtz* determined that although there is no constitutional right to be conditionally released on parole, if a state's statutory scheme employs mandatory language that creates a presumption that parole release will be granted if certain designated findings are made, the statute gives rise to a constitutional liberty interest. *See Greenholtz*, 442 U.S. at 7, 12; *Allen*, 482 U.S. at 377-78.

As discussed *infra*, California statutes and regulations afford a prisoner serving an indeterminate life sentence an expectation of parole unless, in the judgment of the parole authority, he "will pose an unreasonable risk of danger to society if released from prison." Title 15 Cal. Code Regs., § 2402(a). The Ninth Circuit has therefore held that "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion*, 306 F.3d at 902. To similar effect, *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) held that California Penal Code § 3041 vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." This "liberty interest is created, not upon the grant of a parole date, but

REPORT AND RECOMMENDATION -6

upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 915 (2003). *See also Sass*, 461 F.3d at 1127.

Because the Board's denial of parole interfered with petitioner's constitutionally-protected liberty interest, this Court must proceed to the second step in the procedural due process analysis and determine whether the procedures accompanying that interference were constitutionally sufficient. "[T]he Supreme Court [has] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record.'" *Irons*, 505 F.3d at 851 (citing *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard applies in prison disciplinary proceedings)). The "some evidence" standard requires this Court to determine "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56. Although *Hill* involved the accumulation of good time credits rather than release on parole, later cases have held that the same constitutional principles apply in the parole context because both situations directly affect the duration of the prison term. *See e.g., Jancsek v. Or. Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme Court in *Hill* in the parole context); *accord*, *Sass*, 461 F.3d at 1128-29); *Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904.

"The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact," however. *Hill*, 472 U.S. at 456. Similarly, the "some evidence" standard is not an invitation to examine the entire record, independently assess witnesses' credibility, or re-weigh the evidence. *Id.* at 455. Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

REPORT AND RECOMMENDATION -7

*See id.* at 454. The Court in *Hill* added an exclamation point to the limited scope of federal habeas review when it upheld the finding of the prison administrators despite the Court's characterization of the supporting evidence as "meager." *See id.* at 457.

      B.     *California's Statutory and Regulatory Scheme*

In order to determine whether "some evidence" supported the Board's decision with respect to petitioner, this Court must consider the California statutes and regulations that govern the Board's decision-making. *See Biggs*, 334 F.3d at 915. Under California law, the Board is authorized to set release dates and grant parole for inmates with indeterminate sentences. *See* Cal. Penal Code § 3040 and 5075, *et seq*. Section 3041(a) requires the Board to meet with each inmate one year before the expiration of his minimum sentence and normally set a release date in a manner that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public, as well as comply with applicable sentencing rules. Subsection (b) of this section requires that the Board set a release date "unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." *Id.*, § 3041(b). Pursuant to the mandate of § 3041(a), the Board must "establish criteria for the setting of parole release dates" which take into account the number of victims of the offense as well as other factors in mitigation or aggravation of the crime. The Board has therefore promulgated regulations setting forth the guidelines it must follow when determining parole suitability. *See* 15 CCR § 2402, *et seq*.

Accordingly, the Board is guided by the following regulations in making a determination whether a prisoner is suitable for parole:

REPORT AND RECOMMENDATION -8

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 CCR § 2402(a) and (b). Subsections (c) and (d) also set forth suitability and unsuitability factors to further assist the Board in analyzing whether an inmate should be granted parole, although "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." 15 CCR § 2402(c).

In examining its own statutory and regulatory framework, the California Supreme Court in *In re Lawrence* recently held that the proper inquiry for a reviewing court is "whether some evidence supports the *decision* of the Board … that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." *In re Lawrence*, 44 Cal.4th 1181, 1212 (2008). The court also asserted that the Board's decision must demonstrate "an individualized consideration of the specified criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." *Id*. at

1204-05, 1212.  As long as the evidence underlying the Board's decision has "some indicia of reliability," parole has not been arbitrarily denied.  *See Jancsek*, 833 F.2d at 1390.  As the California courts have continually noted, the Board's discretion in parole release matters is very broad.  *See Lawrence*, 44 Cal.4th at 1204.  Thus, the penal code, corresponding regulations, and California law clearly establish that the fundamental consideration in parole decisions is public safety and an assessment of a prisoner's current dangerousness.  *See id.*, at 1205-06.

    C.    *Summary of Governing Principles*

By virtue of California law, petitioner has a constitutional liberty interest in release on parole.  The parole authorities may decline to set a parole date only upon a finding that petitioner's release would present an unreasonable present risk of danger to society if he is released from prison.  Where the parole authorities deny release, based upon an adverse finding on that issue, the role of a federal habeas court is narrowly limited.  It must deny relief if there is "some evidence" in the record to support the parole authority's finding of present dangerousness.  The penal code, corresponding regulations, and California law clearly support the foregoing interpretation.

    V.    PARTIES' CONTENTIONS

Petitioner contends that the Board violated his state and federal due process rights by finding him unsuitable for parole without some evidence that he poses an unreasonable risk of danger to society if released from prison.[2]  (*See* Dkt. 1 at A1.)  Specifically, petitioner claims

---

[2] We do not reach petitioner's claim that his state due process rights were violated, as state claims are not cognizable in a federal habeas petition.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (asserting that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

REPORT AND RECOMMENDATION -10

that the Board found him unsuitable based solely upon the immutable facts of the commitment offense, and failed to consider or give appropriate weight to evidence suggesting that petitioner was suitable for parole. (*See id*. at A4, and A6-A7.)

Petitioner also contends that the Board's finding that the murder was committed in an "especially heinous, atrocious, or cruel manner" was arbitrary, because the murder was motivated by his fear of the victim. (*See id*. at A5.) *See also* 15 CCR § 2402(c)(1). As additional support for this argument, petitioner filed a request for judicial notice of a Santa Clara County Superior Court Order entered on August 30, 2007, in an unrelated habeas case, *In re Arthur Criscione*, No. 71614. (*See* Dkt. 8.) The state court concluded that the Board regularly applies this unsuitability factor in an arbitrary manner, because statistical evidence shows that the Board found the commitment offense to be "especially heinous, atrocious, or cruel" in 100% of 2,690 randomly chosen cases. (*See id.* at 2, and 4-19.) Thus, petitioner claims this evidence supports his argument that the Board's findings concerning petitioner's commitment offense were arbitrary as well. (*See id.* at 1.)

Respondent claims that petitioner does not have a constitutionally protected liberty interest in being released on parole, that the "some evidence" standard is inapplicable in this context, and that even if he does have a protected liberty interest, the Board adequately predicated its denial of parole on "some evidence." (*See* Dkt. 6 at 3-4, and 8-14.) Accordingly, respondent argues that petitioner's due process rights were not violated by the Board's 2006 decision, and the Trinity County Superior Court's Order upholding the Board's 2006 parole denial was not an unreasonable application of clearly established federal law. (*See id*. at 3-4, and 14-17.) Respondent also opposes petitioner's request for judicial notice of the Santa Clara County Superior Court's Order on the ground that the court's findings are not

a proper subject for judicial notice.  (*See* Dkt. 9 at 1-3.)

## VI. ANALYSIS OF RECORD IN THIS CASE

### A. *Analysis*

The Board based its decision that petitioner was unsuitable for parole primarily upon his commitment offense, as well as petitioner's pattern of criminal conduct, failure to profit from society's previous attempts to correct his criminality, failure to demonstrate insight and remorse regarding the commitment offense, and failure to demonstrate insight regarding his prior drug use.  (*See* Dkt. 1, Ex. A at 45-53.)  *See also* 15 CCR § 2402(b) (requiring the Board to consider a prisoner's "past and present attitude toward the crime," "past criminal history, including involvement in other criminal misconduct which is reliably documented," as well as "the base and other commitment offenses, including behavior before, during, or after the crime"); 15 CCR § 2402(c)(1) (providing that a commitment offense carried out "in an especially heinous, atrocious, or cruel manner" constitutes a factor tending to indicate unsuitability for parole).  After considering all reliable evidence in the record, the Board concluded that evidence of petitioner's positive behavior in prison did not outweigh evidence of his unsuitability for parole.  (*See* Dkt. 1, Ex. A at 45, and 49.)

With regard to the circumstances of the commitment offense, the Board concluded that although the murder was an "anomaly" compared with petitioner's relatively stable social history, the offense was carried out in an especially heinous, atrocious, or cruel manner.  (*See id*. at 45.)  *See also* 15 CCR § 2402(c)(1).  Petitioner confronted the victim with a loaded shotgun and then shot at the victim without warning, initiating a shootout between the two men.  (*See* Dkt. 1, Ex. A at 11.)  Although petitioner heard the victim yell, "you got me, it's over," or "give it up, you got me," he entered the ranch house and reloaded his shotgun.  (*Id*.)

REPORT AND RECOMMENDATION -12

Petitioner then returned to the spot where the victim was lying face down on the ground with his gun in his hand, and shot the victim in the back at close range. (*Id.*) Based upon these facts in the record, the Board reasonably concluded that the murder was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. (*See id.* at 46.) *See also* 15 CCR § 2402(c)(1)(D). The Board also concluded that the motive for the crime was inexplicable or very trivial in relation to the offense, because although petitioner may have been afraid of the victim, there were several opportunities for petitioner to leave the situation. (*See* Dkt. 1, Ex. A at 46.) *See also* 15 CCR § 2402(c)(1)(E). He chose instead to resort to violence. (*See* Dkt. 1, Ex. A at 46.) The evidence of the circumstances surrounding petitioner's commitment offense and the trivial motive provide some evidence to support the Board's finding that the murder was carried out in an especially heinous, atrocious, or cruel manner.

As mentioned above, petitioner requests that this Court take judicial notice of a Santa Clara County Superior Court Order entered in an unrelated habeas case because it contains statistical evidence suggesting that the Board regularly applies the commitment offense unsuitability factor, 15 CCR § 2402(c)(1), in an arbitrary manner. (*See* Dkt. 8 at 1-2, and 4-19.) *See also* Fed. R. Evid. 201(b)(2) (permitting the court to take judicial notice of a fact that is "not subject to reasonable dispute in that it is … (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."). Because petitioner brings this evidence to the Court's attention as further support for the arguments set forth in his petition, this Court recommends petitioner's request for judicial notice be construed as supplemental briefing in support of his petition. Accordingly, the Court has considered the Santa Clara County Superior Court's Order, but finds the statistical

REPORT AND RECOMMENDATION -13

evidence does not alter the above conclusions that the Board, in this case, provided some evidence to support its finding regarding the commitment offense.

The second and third factors relied upon by the Board were petitioner's pattern of criminal conduct and failure to profit from society's previous attempts to correct his criminality, such as previous grants of probation. (*See id*. at 47-48.) The applicable guidelines direct the Board to consider all relevant and reliable information, including "a prisoner's past criminal history," and "behavior before, during, and after [the base and other commitment offenses]." *See* 15 CCR § 2402(b). As a result, the Board properly considered petitioner's juvenile conviction for burglarizing a home, his adult conviction for disturbing the peace, for which petitioner received six-months probation, and his adult conviction based upon several traffic violations, for which petitioner received thirty-six-months probation and twenty-days imprisonment. (*See* Dkt. 1, Ex. A at 12-14, 48.) Petitioner's prior criminal convictions and grants of probation provide some evidence to support the Board's finding that petitioner has a pattern of criminal conduct and has failed to profit from society's previous attempts to correct his criminality.

The fourth factor relied upon by the Board was petitioner's failure to demonstrate insight and adequate remorse for the commitment offense. The Board is required to consider a prisoner's "past and present attitude toward the crime." (*See* Dkt. 1, Ex. A at 48-50.) *See* 15 CCR § 2402(b). Although petitioner declined to discuss the facts of the crime at the parole hearing, when the Board asked petitioner how he feels about the commitment offense, he responded, "It's hard to articulate, I mean, it's hard to even come up with words to describe taking another man's life. I mean, I never thought that something like this would happen in my life and I just, it's difficult for me to talk about." (Dkt. 1, Ex. A at 8, and 35.)

Based upon petitioner's statements to the panel and his demeanor during the hearing, the Board concluded that petitioner had failed to engage in "soul searching about taking this man's life," and that he remained disconnected from the offense. (*Id*. at 51.) The Board indicated that even if petitioner refrains from discussing the facts of the offense during the hearing, he needed to express remorse for his actions and tell the Board "why this happened and how [he] felt about it." (*Id*. at 50.) The Board also found that the most recent staff psychologist's report did not include sufficient information about the doctor's discussion with petitioner about the murder, or include an assessment of petitioner's current dangerousness if released. (*See id*. at 48-50.) As to dangerousness, the most recent report indicated the "[a]ssessment of [petitioner's] dangerousness if released to the community is seen as below average in comparison with other inmates." (*See id*, Ex. B at 4.) While the Board did not explicitly state how it regarded this as incomplete, the most reasonable inference is that they sought a more general assessment of petitioner's dangerousness, not limited to a comparison to the dangerousness of other inmates. Therefore, the Board requested that a new clinical evaluation be conducted before the next parole hearing. (*See id*., Ex. A at 49-50.) Contrary to petitioner's argument that the "record is replete with petitioner's remorse," petitioner's statements to the panel, his demeanor during the hearing, and the incomplete psychological evaluation provide some evidence to support the Board's conclusion that petitioner failed to demonstrate sufficient insight and remorse regarding the offense. (*See id*. at A5.) *See also* 15 CCR § 2402(d)(4).

Finally, the Board found that petitioner failed to demonstrate insight regarding the reasons for his prior drug use, and only recently made progress through the drug abuse programs offered in prison. (*See* Dkt. 1, Ex. A at 48, and 53.) During the hearing, petitioner

REPORT AND RECOMMENDATION -15

admitted using methamphetamine, cocaine, marijuana, and alcohol from age 15 until he was incarcerated for the commitment offense. (*See id*. at 16-17.) The Board asked petitioner what would prevent him from re-offending in the future, and petitioner cited his commitment to sobriety and desire to do something productive with his life. (*See id*. at 34.) When the Board asked petitioner what had originally motivated him to experiment with drugs, however, petitioner said, "I don't know, I've asked myself that question many times." (*Id*. at 17.) The Board therefore concluded that petitioner did not demonstrate sufficient comprehension regarding "what got you going on drugs … and attracted to the drug culture … we've got to be able to see some evidence that you've come to terms with that, that you understand that. So not only can you go out there and be a productive member of society, but [we can] determine you're not going to be a member of society that would gravitate back to similar environs, similar company, and do similar things…." (*Id*. at 53.) The Board did not mandate participation in NA, but praised petitioner's participation in that program. (*See id*. at 48, and 51.) It also noted his gains were recent because petitioner did not participate in self-help until 2006. (*Id*.) Thus, there is some evidence to support the Board's finding that petitioner failed to demonstrate insight regarding the reasons for his prior drug use, and only recently began to benefit from the drug abuse programs in prison.

      As stated above, it is beyond the authority of a federal habeas court to determine whether evidence of suitability outweighs the circumstances of the commitment offense, together with any other reliable evidence of unsuitability for parole. The Board has broad discretion to determine how suitability and unsuitability factors interrelate to support its conclusion of current dangerousness to the public. *See Lawrence*, 44 Cal.4th at 1212. Contrary to petitioner's argument that the Board failed to consider most of the parole

REPORT AND RECOMMENDATION -16

suitability rules which favored petitioner, the Board acknowledged that petitioner has made "excellent" residential and employment plans for release, and developed highly marketable skills in the areas of aerospace, sheet metal mechanics, vocational welding, sculpture, and oil painting. (*See* Dkt. 1, Ex. A at 29 and 49.) *See also* 15 CCR § 2402(d)(8). Specifically, the Board cited petitioner's employment offer as a sheet metal mechanic, and praised his "exceptional" skills as an artist. (*See* Dkt. 1, Ex. A at 49-51.) The Board considered petitioner's exemplary disciplinary record, educational accomplishments, donations of artwork to charitable organizations, numerous positive chronos, the absence of opposition to his release by the law enforcement agency or district attorney, and his relatively stable home life and social history, apart from his drug use. (*See id*. at 23-25, and 48-49.) The Board also commended petitioner for his recent progress in NA, and encouraged him to continue to participate in self-help therapy programs in the future if they are available. (*See id*. at 49.)

It is therefore an inaccurate characterization of the record to say that the Board failed to consider evidence that favored petitioner, found him unsuitable for parole based solely upon the immutable facts of the commitment offense, or mandated his continued participation in NA. (*See* Dkt. 1 at A4, and A6-A7.) The Board's failure to find that the "stress and trauma associated with being in a gun battle" prior to the murder constituted a factor weighing in favor of suitability was also well within the Board's discretion, because petitioner initiated the gun battle. (*See id*. at A3.) *See* 15 CCR § 2402(d)(4). Although the Board praised petitioner's progress in prison, it determined that his commitment offense, pattern of criminal conduct, failure to benefit from society's previous attempts to correct his criminality, and failure to demonstrate insight and remorse regarding his commitment offense and prior drug use, indicate that he remains an unreasonable risk of danger to society if released on parole.

REPORT AND RECOMMENDATION -17

B. *State Court Proceedings*

Petitioner's habeas petitions filed in the California Court of Appeal and California Supreme Court contained the same claims as his Trinity County Superior Court petition, and both petitions were summarily denied. (*See* Dkt. 6 at 4-5; Dkt. 1, Ex. F at 3-4.) The parties agree that petitioner has properly exhausted his state court remedies, and timely filed the instant petition. (*See* Dkt. 1, Ex. F at 1-4; Dkt. 6 at 5.) This Court reviews the Trinity County Superior Court's Order upholding the Board's decision to determine whether it meets the deferential AEDPA standards, as it is the last reasoned state court decision. *See Ylst*, 501 U.S. at 803-04.

In a reasoned decision denying petitioner's request for habeas relief, the Trinity County Superior Court asserted that based upon its review of the record, the Board's decision was supported by some evidence. (*See* Dkt. 1, Ex. F at 2.) The court reviewed the facts of the commitment offense, the record of the parole hearing, and the Board's findings regarding both suitability and unsuitability factors. (*See id*. at 1-2.) Specifically, the court noted that the commitment offense, "petitioner's failure to provide some evidence that he has come to terms with what caused this anomalous act, coupled with his unwillingness or inability to benefit from substance abuse programs offered to him in prison," were central to the Board's decision that petitioner was unsuitable for parole. (*Id*. at 2.) Consequently, the court concluded that the Board's findings were not arbitrary, and the decision was within its broad discretion. (*See id*.) Because the state court decision upholding the Board's findings satisfies the "some evidence" standard, there is no need to reach respondent's argument that another standard applies.

## VII. CONCLUSION

Given the totality of the Board's findings, there is some evidence that petitioner's release as of the date of the Board's decision, November 14, 2006, would have posed an unreasonable risk to public safety. The Trinity County Superior Court's Order upholding the Board's decision was therefore not contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of facts. Accordingly, I recommend the Court find that petitioner's due process rights were not violated and that the petition be denied, and this action be dismissed with prejudice. In addition, I recommend petitioner's "Request For This Court To Take Notice Of New Evidence In Support Of Petitioner's Claim" (Dkt. 8) be stricken from the record as moot and construed as supplemental briefing in support of his petition.

This Report and Recommendation is submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with this Report and Recommendation, any party may file written objections with this Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Report and Recommendation." Failure to file objections within the specified time may waive the right to appeal the District Court's Order. *See Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). A proposed order accompanies this Report and Recommendation.

DATED this 22nd day of May, 2009.

JOHN L. WEINBERG
United States Magistrate Judge